**UNITED STATES of America,
Appellee,**

v.

**Ruben FELICIANO, aka Rude Dog, aka Roob Dog, Ronald Pagan, aka Twin, and Nelson Gonzalez, aka Snoop, Defendants–Appellants.**

**Docket Nos. 99–1289, 99–
1290 and 99–1318.**

United States Court of Appeals,
Second Circuit.

Argued: June 9, 2000

Decided: Aug. 16, 2000

Karen L. Peck, Assistant United States Attorney (Stephen C. Robinson, United States Attorney for the District of Connecticut, Anthony E. Kaplan, Assistant United States Attorney, of counsel), for Appellee.

Michael O. Sheehan, Sheehan & Reeve, New Haven, CT, for Appellant Ruben Feliciano.

John W. Mitchell, New York, NY, for Appellant Ronald Pagan.

Steven M. Statsinger, Legal Aid Society, Federal Defender Division, New York, NY, for Appellant Nelson Gonzalez.

Before: STRAUB and KATZMANN, Circuit Judges, and HODGES,* District Judge.

KATZMANN, Circuit Judge:

Defendants-appellants Ruben Feliciano ("Feliciano"), Ronald Pagan ("Pagan"), and Nelson Gonzalez ("Gonzalez") appeal

---

* The Honorable Wm. Terrell Hodges, Senior Judge, United States District Court for the Middle District of Florida, sitting by designation.

from judgments of conviction entered by the United States District Court for the District of Connecticut (Peter C. Dorsey, *Senior Judge*). At trial in January and February of 1999, Feliciano, Pagan, and Gonzalez, members of a gang known as Los Solidos, were found guilty by a jury of conspiring to murder and murdering 16–year old fellow member Edwin Ramos, in violation of 18 U.S.C. § 1959. Feliciano and Pagan were also found guilty of firearms offenses, in violation of 18 U.S.C. § 924(c)(1) and (2). On this appeal, appellants do not challenge the sufficiency of the evidence as to their participation in this execution-style murder. Instead, their challenges relate primarily to the fact that their prosecution was conducted by federal, rather than state, authorities under a federal statute, 18 U.S.C. § 1959, which allows federal authorities to prosecute violent crime when those allegedly responsible participated in the violent crime in order to gain, maintain, or increase a position in an enterprise engaged in racketeering activity. *See* 18 U.S.C. § 1959.

Defendants-appellants claim that the district court erred (1) by conducting portions of *voir dire* outside their hearing; (2) in instructing the jury that under § 1959, Los Solidos' activities need only have had a minimal effect on interstate or foreign commerce; and (3) by admitting allegedly improper testimony by law enforcement agents. Defendants-appellants also claim, *inter alia*, (4) that the evidence at trial was insufficient to show that Los Solidos engaged in racketeering activity, as required by § 1959; (5) that the prosecutor made certain improper and highly prejudicial comments in her rebuttal summation; and (6) that the district court misunderstood its sentencing authority under § 1959. In addition, (7) defendants-appellants for the first time on appeal raise several constitutional challenges to § 1959. We find claims 1 through 6 to be without merit, and that the constitutional claims were waived. Accordingly, we affirm the district court in all respects at issue.

## BACKGROUND

On the evening of March 24, 1997, Feliciano, Pagan, and Alex Rivera, members of the Meriden, Connecticut chapter of Los Solidos, a gang with members in Meriden and other Connecticut cities, drove with fellow member Edwin Ramos, aged 16, to a cemetery in Meriden. Upon bringing Ramos to this site, Feliciano, in the morning hours of March 25, shot Ramos in the head. The company then left Ramos' dead or dying body on the cemetery grounds. Because of evidence that the murder was an execution ordered and carried out by members of Los Solidos, a gang that trafficked in drugs in several cities in Connecticut, federal authorities sought to prosecute those allegedly responsible for the murder under 18 U.S.C. § 1959, which prohibits violent crime in aid of racketeering ("VCAR").

On September 1, 1998, a federal grand jury sitting in New Haven, Connecticut, returned a superseding indictment against Feliciano, Pagan, and Gonzalez. All three were charged in Count One with conspiring to commit a violent crime (the murder of Ramos) in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5), and, in Count Two, with committing a violent crime in aid of racketeering, and aiding and abetting, in violation of 18 U.S.C. § 1959(a)(1) and (2). Feliciano and Pagan were charged in Count Three, respectively, with using and carrying a firearm during and in relation to a crime of violence, and aiding and abetting, in violation of 18 U.S.C. § 924(c)(1) and (2).

Trial was held in New Haven before the Honorable Peter C. Dorsey, Senior United States District Judge for the District of Connecticut. On January 4, 1999, venire persons were assembled for possible service with respect to four trials—the trial for the case at hand, two other criminal trials (one with two defendants, the other with one defendant), and a civil rights action brought by a *pro se* prison inmate.

During the selection process, the venire persons available for these trials were present together in the same courtroom with the defendants in the three criminal trials and the inmate plaintiff—a situation that caused some concern to the marshals responsible for security.[1]

During the two days of *voir dire*, the venire persons were asked many questions in open court, with all three defendants in the instant case present from the beginning and throughout, and able to observe the venire members and hear their responses. For example, at the beginning of *voir dire*, the venire members available for all trials responded orally in open court to some written questions previously presented to them, such as: whether they or anyone close to them had been victims of, or charged with, a crime; whether they had close ties to law enforcement; and whether they or their families or friends had a problem with drugs or with police. At the urging of Feliciano's counsel, the court permitted some of the venire persons to come to the bench to discuss questions they might feel uncomfortable discussing in open court, relating to such matters as personal or family members' involvement with crime or drugs. However, citing security concerns expressed by the marshals, the court denied Feliciano's counsel's request that the defendants be allowed to come to the bench to hear these responses. The district court did, however, permit defense counsel, who participated in the bench inquiries, to interrupt the bench questioning at any time in order to consult with the defendants, should they desire to do so, and to return to the bench with any additional questions suggested through such consultation.

When the time came to pick the jury for the civil rights case, venire persons were asked, among other things, whether they would give less consideration to a prison inmate, and whether they had ever made a complaint about law enforcement. When attention turned to selection of jurors for the case at hand, the venire persons were asked, among other things, about: whether they knew the witnesses or other individuals involved in the case; whether they had any experiences with law enforcement agents; their understanding of the presumption of innocence; their feelings about the Government's possible presentation of evidence of tape-recorded conversations; their feelings about the Government's use of informants; whether they could fairly judge evidence relating to a homicide; their attitudes toward Hispanics; whether they could fairly judge evidence that might show that the defendants were members of a gang or were involved in narcotics activity; whether they had heard of Los Solidos or of the Latin Kings, a rival gang, and, if so, whether what they heard would influence their judgment in the case at hand.

With respect to the question whether they had heard about Los Solidos, venire members who wished to do so were permitted—again at the urging of Feliciano's counsel—to approach the bench and were questioned as before outside the hearing of the defendants but in the presence of defense counsel, about what they knew or had heard about Los Solidos. The district court again told defense counsel that they could interrupt the bench colloquy to consult with the defendants about matters revealed at the bench and to put further questions to the venire persons that might arise from such consultation. Two persons who eventually served on the jury were among those who came to the bench and were questioned by the court and by counsel about what they had read or heard relating to Los Solidos, and whether any such reports would influence their judgment in this case.

Only one other person who served on the jury approached the bench, and that

---

1. In the course of the proceedings, the one-defendant criminal case was disposed of by plea.

for the purpose of discussing whether a medical appointment he had might interfere with service on the jury. According to the district court, "[the] defendants observed the process [at the bench] from no more than 15 feet away." At no time did any defense counsel take advantage of the court's permission to interrupt the bench colloquy to consult with his client about information provided by potential jurors at the sidebar.

At the conclusion of all questioning, the peremptory strikes were made in open court, with the defendants able to observe the process and to consult with counsel as to any matters revealed in open court or at the bench. Although armed with the information provided through open court *voir dire* and with the opportunity to consult with the defendants concerning any bench colloquy, apart from the objection to the method of questioning, none of the defense counsel expressed dissatisfaction with the composition of the jury selected for service.

With respect to the murder of Edwin Ramos, the Government's evidence at trial was essentially as follows. Members of Los Solidos were upset that Ramos, a member of Los Solidos and a former member of the Latin Kings, had sold a gun—possibly to a member of the rival Latin Kings—that had been given to him by Nelson Gonzalez, the president of Los Solidos' Meriden chapter. Gonzalez told Ronald Pagan, the "warlord" of the Meriden chapter, that Ramos should be "terminated," which Solido members Alex Rivera and Keith Streeter understood to mean that Ramos was to be killed. Gonzalez entrusted Pagan and Ruben Feliciano, a probationary member of Los Solidos, with the task of "terminating" Ramos.

According to the evidence adduced by the Government, on the evening of March 24, 1997, Pagan and Feliciano drove to the apartment of Naomi Rivera in Meriden, where they picked up Edwin Ramos and drove with him to the home of Alex Rivera. After stopping at a store, Pagan, Feliciano,

Alex Rivera, and Ramos then drove to a cemetery in Meriden, where all four exited the car. Feliciano asked Ramos what had happened to the gun that Gonzalez had given him. Upon being asked this question a second time, Ramos said that he might have lost the gun. Feliciano laughed and then shot Ramos once in the head, killing him.

Apart from the evidence relating to the murder of Edwin Ramos, the Government also introduced evidence concerning the organizational structure of Los Solidos and the drug trafficking activities of its members. This evidence was provided primarily through the testimony of two investigating agents—FBI Special Agent Jeff Rovelli and Sergeant Ronald Bair of the Hartford Police Department—and through former members of Los Solidos.

Special Agent Rovelli testified that, from the beginning of 1994 up to the time of trial, he participated in a joint task force ("Task Force"), composed of federal, state, and local law enforcement officers, investigating violent gang activity in Hartford, Connecticut, with attention focused particularly on Los Solidos. Rovelli eventually became the coordinator of the Task Force's activities. He took part, *inter alia*, in the execution of federal and state search warrants at Solido locations, pursuant to which narcotics, firearms, and copies of Los Solidos' by-laws were seized. He also participated in court-authorized interceptions of phone communications among Solido members and reviewed the results of other electronic surveillance of gang communications. On the basis of this extensive experience with Los Solidos, Rovelli was permitted by the district court to testify as an expert as to the structure, leadership, practices, terminology, and operations of Los Solidos. Rovelli also testified as a fact witness about, for example, the Task Force's execution of search warrants at the residences of Solido members at Natalie Street in Hartford and at Blue Hills Avenue in Bloomfield, Connecticut, where copies of Los Solidos' by-laws and

other Solido documents were seized. He further testified that he orchestrated controlled and undercover narcotics purchases from members of Los Solidos and conducted surveillance as those purchases occurred, including purchases close to the time of the Ramos murder. Rovelli also testified that he participated in the seizure of narcotics and narcotics paraphernalia from Los Solidos locations.

Sergeant Bair was not offered by the Government as an expert witness. He testified that on April 18, 1997, while working as a detective in the narcotics division of the Hartford Police Department, he personally observed a confidential informant, acting under his direction and control, making an undercover purchase of crack cocaine at the residence of Solido member Michael Martin at 76 Hamilton Street in Hartford, on the basis of which he was able to obtain a search warrant for that location that resulted, *inter alia,* in the seizure of heroin and a copy of the by-laws of Los Solidos.

Keith Streeter, one of the former members of the Meriden chapter of Los Solidos whom the Government called to the witness stand, testified that he joined Los Solidos, in part, in order to make money selling narcotics. Streeter confirmed the testimony of Special Agent Rovelli that Solido members were required to pay ten percent of their earnings, including proceeds from drug sales, into the chapter "kitty"—maintained by the chapter "Treasurer"—as dues. Streeter further testified that he personally participated with other members of Los Solidos in selling cocaine, and that Solido members sold drugs throughout the city of Meriden, including areas "controlled" by Los Solidos.

On February 2, 1999, presentation of evidence was completed. On February 8, 1999, the jury returned its verdicts, finding all defendants guilty on all counts charged.

On April 29, 1999, Feliciano and Pagan were sentenced principally to life imprisonment on Count Two (the substantive VCAR count), to run concurrently with a sentence of ten years' imprisonment on Count One (the VCAR conspiracy count) and consecutively to a sentence of sixty months' imprisonment on Count Three. On May 25, 1999, Gonzalez was sentenced principally to life imprisonment on Count Two, to run concurrently with a sentence of ten years' imprisonment on Count One.

## DISCUSSION

### A. *Jury Selection*

The district court, in accordance with a request from Feliciano's counsel, occasionally interrupted the questioning of venire members in open court in order to bring some venire members to the bench to be questioned on certain limited issues. Feliciano argues, however, that conducting this questioning, over counsel's objection, outside the hearing of the defendants violated his constitutional rights under the Fifth and Sixth Amendments and his right to be present under Rule 43(a) of the Federal Rules of Criminal Procedure. *See* Fed. R.Crim.P. 43(a) ("The defendant shall be present at the arraignment, at the time of the plea, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by this rule."). Feliciano contends that this defect in the conduct of *voir dire* was of structural dimension, its potentially prejudicial effects being of such magnitude as to require vacatur of his convictions and remand for retrial.

■ "The process of empaneling a jury is firmly entrusted to the sound discretion of the trial judge and will not be disturbed absent an abuse of this discretion." *United States v. Morales,* 185 F.3d 74, 84 (2d Cir.1999) (internal quotation marks omitted); *cert. denied,* —— U.S. ——, 120 S.Ct. 1282, 146 L.Ed.2d 229 (2000).

■ "[T]here may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with

the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." *Chapman v. California*, 386 U.S. 18, 22, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).[2] The Supreme Court has distinguished two kinds of errors that can occur at, or in relation to, a criminal proceeding: so-called "trial errors," which are of relatively limited scope and which are subject to harmless error review, and "structural defects," which require reversal of an appealed conviction because they "affect[ ] the framework within which the trial proceeds." *Arizona v. Fulminante*, 499 U.S. 279, 307–10, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). "Errors are properly categorized as structural only if they so fundamentally undermine the fairness or the validity of the trial that they require voiding its result regardless of identifiable prejudice." *Yarborough v. Keane*, 101 F.3d 894, 897 (2d Cir.1996).

1. *If the district court erred in conducting a portion of voir dire outside the hearing of defendants, was that error structural?*

■ "To determine whether an error is properly categorized as structural, we must look not only at the right violated, but also at the particular nature, context, and significance of the violation." *Yarborough*, 101 F.3d at 897.

We note first that defendants have cited no case—and we have found none—in which an appellate court has found a structural defect where a defendant was present throughout but unable to hear a circumscribed portion of *voir dire*, and whose counsel was allowed to consult with him about the limited questioning outside his hearing. The Supreme Court has "found structural errors only in a very limited class of cases," *Johnson v. United States*, 520 U.S. 461, 468, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997). Situations in which

courts have found structural error involve violations of a defendant's rights far more serious than any claimed here. *See, e.g., Fulminante*, 499 U.S. at 309–10, 111 S.Ct. 1246 (noting that the total deprivation of the right to counsel at trial, a judge who was not impartial, unlawful exclusion of members of the defendant's race from a grand jury, and violations of the right to self-representation at trial and of the right to a public trial are "structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards"); *Sullivan v. Louisiana*, 508 U.S. 275, 281–82, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (holding that erroneous reasonable-doubt instruction is structural error); *Tankleff v. Senkowski*, 135 F.3d 235, 240 (2d Cir.1998) (holding that exclusion of jurors from petit jury on the basis of race is structural error). Further, the Supreme Court has not held that a trial court's exclusion of a defendant from a portion of a criminal proceeding is *ipso facto* a structural defect. *See Rushen v. Spain*, 464 U.S. 114, 120–21, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983) (applying harmless error review to trial judge's conversations with juror in defendant's absence concerning evidence at trial of which the juror had prior knowledge); *see also United States v. Gagnon*, 470 U.S. 522, 526, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985) (" '[T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only.' " (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105–06, 54 S.Ct. 330, 78 L.Ed. 674 (1934) (modification in original))).

Our Court has stated that

*Fulminante* and *Rushen* require us to consider the nature of a "presence error" in the context of the specific proceeding from which the defendant was

---

2. Because Feliciano claims that both his constitutional rights and his rights under Rule 43(a) were violated at *voir dire,* we apply caselaw on the constitutional right to presence and harmless constitutional error, and

also consider cases involving challenges based on Rule 43(a) alone, which are subject to harmless error review under Rule 52(a) of the Federal Rules of Criminal Procedure.

excluded. In the usual case, such an error will be susceptible to harmless error analysis, but a defendant's absence from certain stages of a criminal proceeding may so undermine the integrity of the trial process that the error will necessarily fall within that category of cases requiring automatic reversal. *Yarborough,* 101 F.3d at 898 (quoting *Hegler v. Borg,* 50 F.3d 1472, 1476 (9th Cir. 1995)).

■ We express no judgment as to whether the district court's security concerns rendered its decision to exclude the defendants from the limited bench questioning free from error because we conclude that even assuming there was error, it is clear that any error here did not "affect[ ] the framework within which the trial proceed[ed]." *Fulminante,* 499 U.S. at 310, 111 S.Ct. 1246. Feliciano and his co-defendants were present in the courtroom for the entire jury selection process, with most of the questions answered by the jurors in open court. Defendants were provided by the district court with the unlimited opportunity to consult with their counsel at any time during the limited bench questioning about what was revealed at sidebar and to propose questions to the venire persons who came to the bench. In addition, all three defendants were present and able to consult with counsel when the peremptory challenge process was conducted in open court. Accordingly, we find that any error here was not of such dimension as to undermine the integrity of the trial and require automatic reversal.

2. *If the district court erred in conducting a portion of voir dire outside the hearing of defendants, was that error harmless?*

■ Apart from the reasons stated above, we find the following additional reasons for concluding that any error in the process of selecting the jury, assuming *arguendo* there was such, was harmless

beyond a reasonable doubt. Along with the district court's probing inquiry, counsel for the defendants participated vigorously in questioning the venire persons who came to the bench. Only two venire members who came to the bench to discuss a potentially substantive matter (their exposure to media reports concerning Los Solidos) were selected to serve on the jury, and their selection was not opposed by any defense counsel. When, after questioning the jurors in open court and (in a few instances) at the bench, the peremptory challenges were made, the defendants were able to discuss with counsel any matters revealed during the bench questioning. *See, e.g., United States v. Washington,* 705 F.2d 489, 498 (D.C.Cir.1983) (*per curiam* ) (finding that it was harmless error beyond a reasonable doubt for the district court to permit potential jurors, seven of whom served on the jury, to be questioned about their prior involvement in the criminal justice system at the bench in the presence of appellant's counsel but out of the direct observation and hearing of the appellant because only a very limited portion of *voir dire* was conducted at the bench, in which appellant's counsel participated and had sufficient time to confer with appellant concerning the jurors' responses); *cf. United States v. Dioguardi,* 428 F.2d 1033, 1039–40 (2d Cir.1970) (Friendly, J.) (noting that the district court was potentially subject to criticism for examining at sidebar prospective jurors who had read or heard anything about any of the defendants, but excusing this procedure because defendants were seated 15–20 feet away from the bench, and their counsel, who had been advised earlier of this procedure, participated in the sidebar questioning and had ample time to consult with the defendants).

We therefore conclude that any error of the district court in conducting the limited portion of *voir dire* at issue in this case was harmless beyond a reasonable doubt.[3]

---

**3.** Because of this finding, we need not decide

whether Pagan and Gonzalez waived the right

B. *The Sufficiency of the Evidence that Los Solidos Engaged in Racketeering Activity and Feliciano's Proposed Instruction on this Element*

(1) *Sufficiency of the Evidence that Los Solidos Engaged in Racketeering Activities*

The VCAR establishes as an essential element of any offense charged under it that the "enterprise" in relation to which the charged crimes were allegedly committed was "an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a). The VCAR, at Section 1959(b)(1), expressly adopts the definition of "racketeering activity" set forth in the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, which provides, in pertinent part, that

(1) "racketeering activity" means ... (D) any offense involving ... a controlled substance ... punishable under any law of the United States.

18 U.S.C. § 1961(1)(D).

The Superseding Indictment alleged that the "Enterprise [i.e., Los Solidos], through its members and associates, engaged in racketeering activity as defined in Title 18, United States Code, Sections 1959(b)(1) and 1961(1), namely, acts involving trafficking in controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1) and 846, and acts involving murder, in violation of Connecticut General Statutes, Sections 53a–54a." Thus, in the instant case the Government was required to prove as an essential element of the charged VCAR offenses that Los Solidos, through its members and associates, engaged in trafficking in controlled substances that would constitute substantive narcotics offenses in violation of 21 U.S.C. § 841, or narcotics conspiracy in violation of 21 U.S.C. § 846, or acts involving murder in violation of Connecticut law. The Government argues that it

to challenge the district court's conduct of jury selection by not objecting to this proce-

adduced abundant evidence of drug trafficking offenses by members of Los Solidos that sufficed to prove that Los Solidos was engaged in racketeering activity.

With respect to the racketeering element, the district court instructed the jury as follows:

The second element that the government must prove beyond a reasonable doubt is that Los Solidos engaged in racketeering activities, in this case trafficking in controlled substances and acts involving murder.

Feliciano contends on appeal that his conviction on the VCAR counts should be reversed because the evidence at trial that Los Solidos was engaged in racketeering activities was insufficient. Specifically, he argues that the Government produced at best "generalized" evidence of narcotics trafficking ranging over a period of years, without providing the jury with evidence of particularized, spatio-temporally defined acts of narcotics trafficking as the Government would be required to do when prosecuting a defendant for particular narcotics offenses under 21 U.S.C. §§ 841 and/or 846.

A defendant challenging a conviction based upon a claim of insufficiency of the evidence bears a heavy burden. *See United States v. Naiman*, 211 F.3d 40, 46 (2d Cir.2000).

We consider the evidence presented at trial in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government. We will not disturb a conviction on grounds of legal insufficiency of the evidence at trial if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Nevertheless, a conviction cannot stand when the Government has not introduced sufficient evidence to sustain each essential ele-

dure below.

ment of the crime charged beyond a reasonable doubt.

*Id.* (citations and internal quotation marks omitted).

Our review of the trial transcript—viewing the evidence, as we must, in the light most favorable to the Government—convinces us that the Government adduced evidence sufficient to persuade any rational juror, drawing inferences from the evidence in favor of the Government, that over a period of several years, Los Solidos, through its members and associates, trafficked in narcotics. Rovelli and Bair testified that they participated in undercover purchases of crack cocaine, powder cocaine, and heroin from members of Los Solidos. On September 20, 1994 and April 18, 1997, task force participants, pursuant to search warrants executed at the residences of Los Solidos members on Natalie Street and Hamilton Street in Hartford, seized drugs, drug paraphernalia, and materials describing the by-laws and activities of Los Solidos. Former Solido member Keith Streeter testified that gang members sold drugs throughout the city of Meriden and that gang members were required to pay a portion of their earnings, including earnings from drug sales, into the chapter's "kitty," maintained by the chapter's "Treasurer." The money thus collected was used to purchase firearms for protection, and a stash of such weapons was held under the control of the gang's "warlord." Los Solidos chapter "Presidents" had authority to order violent "missions," including murder, against nonmembers and to terminate members found to be in violation of the gang's rules. Accordingly, we find that at trial the Government adduced abundant evidence of drug trafficking by members of Los Solidos in violation of 21 U.S.C. §§ 841(a)(1), and that such evidence was more than sufficient to show that Los Solidos engaged in racketeering activities. *See United States v. Gray,* 137 F.3d 765, 773 (4th Cir.), *cert. denied,* 525 U.S. 866, 119 S.Ct. 157, 142 L.Ed.2d 129 (1998) ("[T]he evidence that the enterprise dealt in drugs would ... be sufficient to support a jury finding that the enterprise engaged in racketeering.").

In a footnote to his brief, Feliciano implicitly suggests a further claim not raised below: that the district court erred by not instructing the jury as to the elements of substantive narcotics offenses under 21 U.S.C. § 841 and the elements of narcotics conspiracy under 21 U.S.C. § 846. In his proposed instruction on the racketeering activity element, however, Feliciano requested the court to instruct the jury as follows:

In this case, you must find beyond a reasonable doubt that Los Solidos was an enterprise that engaged in racketeering activity, in this case trafficking in controlled substances in violation of 21 USC Section 841(a)(1) and 846 and acts involving murder in violation of Conn. Gen.Stat. Sections 53a–54a. In this regard, I must instruct you that it is not sufficient that you conclude that some members of Los Solidos may have engaged in these activities, you must find beyond a reasonable doubt that the Enterprise so acted in order to find either of the defendants guilty in this case.

The first sentence of this instruction employs the same generic reference to "trafficking in controlled substances" that the district court employed in the instruction that Feliciano now, on appeal, suggests was defective. Moreover, while Feliciano's proposed instruction refers to 21 U.S.C. §§ 841(a)(1) and 846, it does not request the district court to instruct the jury as to the elements of these offenses. Because Feliciano did not argue or cite any authority in his brief that instruction on these elements was required but only suggested that this omission made the jury's task of finding that Los Solidos engaged in racketeering activities more difficult, there are serious questions as to whether this specific claim is properly before us. In any event, it is clear that Feliciano's counsel, who demonstrated competence and vigorous advocacy throughout jury selection

and trial, as well as on appeal, did not object below to the district court's failure to instruct the jury on the elements of Los Solidos' alleged racketeering offenses. Therefore, examination of this matter is subject to "plain error" analysis under Rule 52(b) of the Federal Rules of Criminal Procedure, guided by the Supreme Court's decision in *United States v. Olano,* 507 U.S. 725, 731–37, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). *See United States v. Miller,* 116 F.3d 641, 672 (2d Cir.1997) ("If there was no objection to the erroneous instruction, the instruction is reviewable on appeal only for 'plain error'....").

 Our court "has restated the first three prongs of the *Olano* test as follows:"

> First, there must be "error," or deviation from a legal rule which has not been waived. Second, the error must be "plain," which at a minimum means "clear under current law." Third, the plain error must, as the text of Rule 52(b) indicates, "affect[ ] substantial rights," which normally requires a showing of prejudice.

*United States v. Bayless,* 201 F.3d 116, 127–28 (2d Cir.) (quoting *United States v. Viola,* 35 F.3d 37, 41 (2d Cir.1994)) *cert. denied,* —— U.S. ——, 120 S.Ct. 1571, 146 L.Ed.2d 474 (2000). "A plain error is an error so egregious and obvious as to make the trial judge and prosecutor derelict in permitting it, despite the defendant's failure to object." *United States v. Gore,* 154 F.3d 34, 43 (2d Cir.1998) (internal quotation marks omitted). On appeal, Feliciano has the burden of persuasion to show that the district court committed plain error. See *id.* at 42.

 Application of plain error analysis to this matter encounters the difficulty that Feliciano did not argue in his appellate brief or at oral argument that the first three prongs of the *Olano* test were satis-

fied here. Counsel for Pagan referred to the district court's omission to instruct on the elements of §§ 841(a)(1) and 846—also for the first time on appeal—in conjunction with one of his constitutional arguments (see below, Section G),[4] but did not argue in his appellate brief that *Olano* was satisfied as to the jury instruction issue (or any other issue). This posture of the case presents obvious difficulties to an appellate court's analysis of the first three prongs of the *Olano* test. *See, e.g., Olano,* 507 U.S. at 734, 113 S.Ct. 1770 (Under Rule 52(b), "[i]t is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice.").

Given our review of the evidence discussed above, however, we find that such analysis is unnecessary in the circumstances of this case. Even if the district court did commit plain error by omitting to instruct on the elements of §§ 841(a)(1) and 846—and an argument for that conclusion may have some force—and even if Feliciano could show that this error "affected [his] substantial rights," there was abundant evidence at trial that Los Solidos engaged in racketeering activities by trafficking in controlled substances (including heroin, cocaine, and crack cocaine) in violation of these statutes. Thus, in our judgment, because the district court's omission did not "seriously affect[ ] the fairness, integrity or public reputation of judicial proceedings," *Olano,* 507 U.S. at 736, 113 S.Ct. 1770, the fourth prong of *Olano* is not satisfied here. *Cf. Johnson,* 520 U.S. at 469, 117 S.Ct. 1544 ("[W]e need not decide [whether *Olano*'s 'substantial rights' prong was satisfied] because, even assuming that the failure to submit materiality to the jury 'affec[ted] substantial rights,' it does not meet the final requirement of *Olano* [because of the abundant evidence of materiality].").

---

4. Pagan referred to the district court's omission to instruct on the elements of §§ 841(a)(1) and 846 in attempting to support his argument that "[t]he district court ... failed to require any proof of the necessary temporal, relational, and/or quantitative relationships required by various elements of the [VCAR]."

(2) *Feliciano's Proposed Instruction on Los Solidos' Racketeering Activities*

 Apart from his contention concerning the sufficiency of proof of Los Solidos' racketeering offenses, Feliciano claims that the district court erred by not providing his proposed instruction because the jury needed to be instructed as to what acts in evidence at trial could constitute racketeering activities of the enterprise. A defendant attempting to show that a district court erred in rejecting a proposed jury charge carries a heavy burden. The defendant must show that his proposed charge "accurately represented the law in every respect, and that the charge actually given, viewed as a whole, prejudiced him." *United States v. Thompson,* 76 F.3d 442, 454 (2d Cir.1996) (internal quotation marks omitted).

 The purported purpose of Feliciano's suggested instruction that "it is not sufficient that you conclude that some members of Los Solidos may have engaged in [racketeering] activities" was to inform the jury that if, for example, individuals who happened to be members of Los Solidos obtained drugs on their own and sold them entirely for their own personal profit, such activity could not count as racketeering activity of Los Solidos. The first problem with this formulation, however, is that that explanation is not at all clear from what the proposed instruction states. Feliciano's proposed instruction distinguishes the activities of members of Los Solidos and of "the Enterprise," not the activities of members of Los Solidos as members and otherwise.

Another problem is that the proposed instruction might have caused the jury to disregard evidence that could legitimately support a finding that the members of Los Solidos as members engaged in drug trafficking. Among other evidence, the jury heard testimony from Solido members who stated that they joined the gang, in part, to take advantage of the gang's drug connections in order to make money selling drugs themselves. There was further testimony that Los Solidos required its members to pay ten percent of the proceeds from their drug sales and other earnings as dues into the gang's "kitty" maintained by the gang's "Treasurer." The jury might have gotten the misimpression from the proposed instruction that such drug sales by "members of Los Solidos" must be categorically disregarded in determining whether "the Enterprise" engaged in racketeering activity.

In addition, the suggested instruction that "you must find beyond a reasonable doubt that the Enterprise [and not the members] so acted" could puzzle the jury as to how the enterprise could act other than through its members. The VCAR provides the following explication of "enterprise:"

> "[E]nterprise" includes any partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity . . .

18 U.S.C. § 1959(b)(2). Especially where a substantial portion of the activities of a "union or group of individuals associated in fact although not a legal entity" are conducted in violation of law,[5] the necessity that informal groups can only act through their individual members (who do not have legally recognized agency status) is particularly apparent. *See United States v. Cutolo,* 861 F.Supp. 1142, 1146 (E.D.N.Y. 1994) ("An enterprise, here a group of individuals associated in fact, can only act through its members, associates, or employees."). Where individuals are associated only "in fact," determining whether the subject enterprise engaged in racketeering activity requires fact-based attention to the ways in which, for example, the

---

5. No defendant in this case has denied the possibility that a street gang can come within the VCAR's concept of an enterprise or that the foundation of this possibility is the VCAR's reference to "any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1959(b)(2).

individuals acted for the group and/or in concert with other members, or acted in ways that contributed to the purposes of the group, or that were facilitated or made possible by the group.[6]

However, rather than focus the jury's attention on the ways in which the members of Los Solidos acted for, or with the aid of, the gang, Feliciano's proposed instruction would turn the jury's attention away from the activities of the members of Los Solidos and toward the actions of "the Enterprise," despite the fact that the statute requires attention to the actions of "*individuals* associated in fact."[7] 18 U.S.C. § 1959(b)(2) (emphasis added). We therefore find that Feliciano's proposed instruction would be confusing to the jury and does not "accurately represent[ ] the law." *Thompson,* 76 F.3d at 454; *see also United States v. Bahna,* 68 F.3d 19, 21 (2d Cir.1995) ("[A] failure to grant a request for instructions that are in any respect incorrect and unsound does not constitute error.") (quoting *Clark v. Pennsylvania R.R.,* 328 F.2d 591, 595 (2d Cir.1964)).

For these reasons, we reject Feliciano's claim that the district court erred in not adopting his proposed charge on Los Solidos' racketeering activities.

C. *The District Court's Instructions on the VCAR's Interstate/Foreign Commerce Element*

With respect to the interstate/foreign commerce element of the VCAR, the district court instructed the jury as follows.

The third element that you must find beyond a reasonable doubt is that the enterprise itself, namely the Los Solidos, or the racketeering activities of those associated with it, had some effect upon interstate or foreign commerce. This

effect on interstate or foreign commerce could have occurred in any way, and it need only have been minimal. It is not necessary that you find that a substantial affect [*sic* ] on interstate or foreign commerce occurred ... So long as activities in furtherance of the enterprise affected interstate or foreign commerce in some minimal way, you may find that this element has been satisfied. It is sufficient, for example, that· in the course of the racketeering activities, members of the enterprise sold narcotics.

Gonzalez, "like many criminal defendants in [recent] years," *see United States v. Goodwin,* 141 F.3d 394, 397 (2d Cir. 1997), invokes the Supreme Court's decision in *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), to challenge his federal criminal conviction. Specifically, he argues that the district court erred when it instructed the jury that the "effect on interstate or foreign commerce [of the activities of Los Solidos] ... need only have been minimal," and that "[i]t is not necessary that [the jury] find that a substantial affect [*sic* ] on interstate or foreign commerce occurred." Gonzalez contends that, in light of *Lopez,* the jury should have been instructed that it had to find the activities of Los Solidos had a substantial—not merely a minimal—effect on interstate or foreign commerce. We find Gonzalez's argument to be without merit.

In *Lopez,* the Supreme Court reaffirmed that "Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce...." 514 U.S. at 558–59, 115 S.Ct. 1624 (citing cases); *see also Goodwin,* 141 F.3d at 398. However,

---

6. In this regard, we note that with respect to the interstate commerce element, the district court instructed the jury that activities that would satisfy this element were "activities *in furtherance of the enterprise* " that affected interstate or foreign commerce. Tr. 2/3/99 at 160 (emphasis added).

7. Although the district court's instruction on this element did not mention the members of Los Solidos, it did not turn the jury's attention away from the actions of the members in the way that Feliciano's proposed instruction would.

[i]n *Lopez,* the Supreme Court held that Congress exceeded its authority under the Commerce Clause in enacting the Gun Free School Zones Act of 1990, 18 U.S.C. § 922(q), which made it a federal offense " 'for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone.' " *Lopez,* 514 U.S. at 551, 115 S.Ct. at 1626 (quoting 18 U.S.C. § 922(q)(1)(A)). The Court reached this conclusion because the Gun Free School Zones Act "neither regulate[d] a commercial activity nor contain[ed] a requirement that the possession be connected *in any way* to interstate commerce." 514 U.S. at 551, 115 S.Ct. at 1626 (emphasis added).

*Goodwin,* 141 F.3d at 398. The Supreme Court also noted that Congress had not made any finding that the activities the Act prohibited had an effect on interstate commerce. *Lopez,* 514 U.S. at 562, 115 S.Ct. 1624.

The basis on which federal prosecution of Gonzalez and his co-defendants was grounded was their commission of a violent crime undertaken for the sake of their membership in a gang that—as the evidence at trial demonstrated—engaged over several years in selling cocaine, crack cocaine, and heroin. In the aftermath of the *Lopez* decision, this Court has repeatedly held that Congress reasonably concluded that narcotics trafficking has a substantial effect on interstate or foreign commerce. *See, e.g., United States v. Miller,* 116 F.3d 641, 674 (2d Cir.1997) (upholding the district court's instruction that defendants' drug trafficking activities prosecuted under RICO need only be "minimal" and "need not be substantial," and stating that *"Lopez* did not alter the principle that where the type of activity at issue has been found by Congress to have a substantial connection with interstate commerce, the government need only prove that the individual subject transaction has a *de minimis* effect on interstate commerce"); *Goodwin,* 141 F.3d at 399

("[D]rug trafficking activity clearly is a proper subject for federal regulation...."); *United States v. Genao,* 79 F.3d 1333, 1337 (2d Cir.1996) (noting that "Congress has made specific findings that local narcotics activity has a substantial effect on interstate commerce"); *Proyect v. United States,* 101 F.3d 11, 12–14 (2d Cir.1996) *(per curiam )* (noting the same point and quoting *Genao* ). Our Court has also held that *Lopez* did not heighten the minimal interstate commerce effect requirement for prosecution of Hobbs Act, RICO narcotics trafficking, and money laundering offenses, all of which are economic activities that in the aggregate have a substantial effect on interstate commerce. *See Miller,* 116 F.3d at 674 (RICO narcotics trafficking); *United States v. Farrish,* 122 F.3d 146, 148 (2d Cir.1997) (Hobbs Act); *United States v. Leslie,* 103 F.3d 1093, 1100 (2d Cir.1997) and *Goodwin,* 141 F.3d at 399–400 (money laundering); *see also Gray,* 137 F.3d at 773 ("Although [the Government's] evidence of the enterprise's connection with interstate commerce is not copious, we are satisfied that it is enough to meet the minimal standard required to satisfy the interstate commerce requirement of [the VCAR].").

■ Moreover, the VCAR has a jurisdictional element requiring the Government in each prosecution to provide evidence of an effect on interstate or foreign commerce. *See United States v. Torres,* 129 F.3d 710, 717 (2d Cir.1997) ("The substantial effect requirement [of *Lopez* ] is satisfied when criminal statutes contain a jurisdictional element ... Section 1959 satisfies the substantial effect requirement [because it] incorporates a jurisdictional element requiring a nexus between the offense in question and interstate commerce."); *cf. Farrish,* 122 F.3d at 149 ("In sharp contrast to the statute at issue in *Lopez,* the Hobbs Act does contain ... a jurisdictional element."); *Goodwin,* 141 F.3d at 400 ("The inclusion of ... jurisdictional elements precludes any serious challenge to the constitutionality of the money

laundering statute ... because [if proven] it guarantees a legitimate nexus with interstate commerce." (internal quotation marks omitted)).

Gonzalez argues that the 'Supreme Court's recent opinion in *United States v. Morrison,* —— U.S. ——, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000), demonstrates—at the very least—that the district court's instruction was erroneous because the Court in *Morrison* stated that Congress lacks authority under the Commerce Clause to regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce. *See id.* at ——, 120 S.Ct. at 1754. At issue in *Morrison* was Section 13981 of the Violent Crime Control and Law Enforcement Act of 1994, § 40302, 42 U.S.C. § 13981, which provided a federal civil remedy for victims of gender-motivated violence. Implicit in Gonzalez's contention is the claim that the VCAR, like Section 13981, is also directed only to noneconomic criminal activity.

Gonzalez's reliance on *Morrison* is misplaced. In *Morrison,* the Supreme Court rejected the argument that Section 13981 regulates activity that substantially affects interstate commerce. In doing so, the Court noted that "[l]ike the Gun–Free School Zones Act at issue in *Lopez,* § 13981 contains no jurisdictional element establishing that the federal cause of action is in pursuance of Congress' power to regulate interstate commerce." *Id.* at ——, 120 S.Ct. at 1751. In addition, the Court rejected petitioners' attempt to link the regulated activity to an effect on interstate commerce, finding the purported link to be based on an attenuated, but-for causal chain of reasoning. *See id.* at —— — ——, 120 S.Ct. at 1752–53.

In contrast to Section 13981, the VCAR, as noted, includes a jurisdictional element and covers only violent crimes linked to the perpetrator's position in an enterprise engaged in racketeering activity that must satisfy the jurisdictional element. As the statute thus makes plain, Congress was not attempting to assert jurisdiction over noneconomic crimes that are constitutionally within the exclusive jurisdiction of state and local government. Rather, as the legislative history indicates, "it is evident that Congress enacted section 1959 in view of the 'Federal Government's strong interest ... in suppressing the activities of organized criminal enterprises.'" *United States v. Mapp,* 170 F.3d 328, 336 (2d Cir.) (affirming a murder conviction under § 1959 and quoting S. REP. No. 98–225, at 305 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3484), *cert. denied,* —— U.S. ——, 120 S.Ct. 239, 145 L.Ed.2d 200 (1999). "[Because] any predicate murder [under § 1959 must] bear a strong relationship to racketeering activity that affects interstate commerce, it does not risk improperly making purely local crimes a matter of federal concern." *Id.*

Moreover, the racketeering activity that satisfies the jurisdictional element in this case—narcotics trafficking—is clearly economic in nature and has been found by Congress to have a substantial effect on interstate commerce. *See, e.g., Genao,* 79 F.3d at 1337 (noting Congress' finding that even local narcotics trafficking has "a substantial effect on interstate commerce"); *Goodwin,* 141 F.3d at 399 ("We have repeatedly held that the 'Controlled Substances Act concerns an obviously economic activity' substantially affecting interstate commerce, namely, narcotics trafficking, and have sustained the Act against criminal defendants' *Lopez* challenges.") (quoting *Genao,* 79 F.3d at 1337, and citing other cases).

 Accordingly, we find that the district court did not err in instructing the jury that it need only find that the activities of Los Solidos—the proof of which at trial related to narcotics trafficking—need only have been minimal.

 Gonzalez also contends that the district court erred when, in its charge to the jury on the interstate commerce element, it stated that for satisfaction of this

element, "[i]t is sufficient, for example, that in the course of the racketeering activities, members of the enterprise sold narcotics." Gonzalez asserts that, in this instruction, the district court implicitly stated that it was true that there were such sales, thus, in effect, improperly directing a verdict on this element. We disagree.

In reviewing a district court's jury instruction, we view a disputed charge within the context of the district court's charges in their entirety. *See United States v. Caban,* 173 F.3d 89, 94 (2d Cir.), *cert. denied,* —— U.S. ——, 120 S.Ct. 174, 145 L.Ed.2d 147 (1999).

The district court instructed the jury that the Government bore the burden of proving beyond a reasonable doubt the existence of each element of each charge as to each defendant. At no point in its instructions did the district court tell the jury that the Government had proven any element of any charge as to any defendant beyond a reasonable doubt or direct the jury that it must find in favor of the Government as to any element of any charge against any defendant. With respect to the element at issue here, the district court instructed the jury that the Government "must prove beyond a reasonable doubt . . . as to each defendant: . . . (2) that Los Solidos engaged in racketeering activity; [and] (3) that such racketeering activity, if found, affected interstate or foreign commerce; . . ."

At trial, witnesses for the Government testified that members of Los Solidos sold drugs and that the drugs bought and sold by Los Solidos moved in interstate or foreign commerce.[8] Viewing the challenged instruction, as we must, in conjunction with the district court's instructions as to what the Government was required to prove, and considering the nature of the Government's efforts at trial to satisfy these requirements, it is clear that the

district court did not, as Gonzalez contends, instruct the jury that the Government had, in fact, proven beyond a reasonable doubt "that in the course of the racketeering activities, members of the enterprise sold narcotics." Rather, the district court instructed the jury that if it credited beyond a reasonable doubt the evidence adduced by the Government, so long as those activities in furtherance of the enterprise affected interstate of foreign commerce in some minimal way (as the Government attempted to show), that finding by the jury would discharge the Government's obligation on the interstate/foreign commerce element of the VCAR counts. For the reasons stated above, that instruction is in accord with the law.

### D. *The Testimony of Rovelli and Bair*

"As a general proposition, the decision of whether to admit expert testimony is left to the discretion of the trial judge and should not be set aside unless manifestly erroneous." *United States v. Duncan,* 42 F.3d 97, 101 (2d Cir.1994) (internal quotation marks omitted). Rule 702 of the Federal Rules of Evidence allows broad discretion to a district court to admit expert testimony "in the form of an opinion or otherwise" when, in the district court's judgment, it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.

In the course of his direct testimony, Special Agent Rovelli responded affirmatively to the following question from the prosecutor:

And based on your participation in the investigation as an organization have the Los Solidos been involved in narcotics trafficking?

Feliciano argues that the district court manifestly erred by permitting Rovelli to affirm this conclusion. This was improper,

---

8. At trial, Special Agent Rovelli testified that heroin and cocaine are not manufactured in Connecticut, and former Solido member

Keith Streeter testified that Los Solidos obtained in New York some of the drugs they sold in Connecticut.

according to Feliciano, because this statement and related statements by Rovelli went beyond the scope of expert testimony and were based, in part, on hearsay statements by informants and on other evidence not before the court. Feliciano also characterizes Rovelli's response as an "ultimate" conclusion that Los Solidos' Meriden chapter was an enterprise engaged in racketeering activity. Feliciano finds similar problems with the testimony of Sergeant Bair, who, although not offered by the Government as an expert witness, was permitted to testify that Los Solidos controlled certain areas of Hartford for narcotics trafficking.

"In evaluating the admissibility of expert testimony, this Court requires the exclusion of testimony [that] states a legal conclusion." *Duncan*, 42 F.3d at 101. Our review of the trial transcript shows that at no point did either Rovelli or Bair use terms from the VCAR, such as "enterprise" or "racketeering activity," or respond to questions using those terms. No legal conclusions were stated by either witness. Moreover, Rule 704(a) of the Federal Rules of Evidence does not forbid all testimony concerning ultimate issues. *See* Fed.R.Evid. 704(a) ("Except as provided in subdivision (b) [concerning expert testimony on the mental state or condition of a defendant in a criminal case], testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."); *United States v. Daly*, 842 F.2d 1380, 1387 (2d Cir.1988). Testimony by Rovelli and Bair about narcotics trafficking by Los Solidos was not objectionable merely because of its pertinence to the issue of whether Los Solidos engaged in racketeering activity.

This Court has repeatedly held that expert testimony admissible under Rules 702 and 703 of the Federal Rules of Evidence can, under certain conditions, be based on hearsay and evidence not admitted at trial. *See, e.g., United States v. Locascio*, 6 F.3d 924, 938 (2d Cir.1993) ("[E]xpert witnesses can testify to opinions based on hearsay or other inadmissible evidence if experts in the field reasonably rely on such evidence in forming their opinions. [The expert witness in this case] was entitled to rely upon hearsay as to such matters as the structure and operating rules of organized crime families ..., since there is little question that law enforcement agents routinely and reasonably rely upon such hearsay in the course of their duties." (citations omitted)); *Daly*, 842 F.2d at 1387 ("[I]f experts in the field reasonably rely on hearsay in forming their opinions and drawing their inferences, the expert witness may properly testify to his opinions and inferences based upon such hearsay.").

Rovelli testified both as an expert and as a fact witness. Such dual testimony is not objectionable in principle. *See United States v. Young*, 745 F.2d 733, 760 (2d Cir.1984) ("[I]t was not improper for the government to elicit ... expert testimony from law enforcement officers who also testified as fact witnesses."). But our review of the trial transcript shows that the line between Rovelli's opinion and fact witness testimony is often hard to discern, and the "facts" testified to are often stated very broadly and generally. For example, Rovelli testified, without supplying specific dates and locations, that he participated in undercover purchases of crack cocaine, powder cocaine, and heroin from members of Los Solidos. However, all three defense counsel had the opportunity, which they seized, to explore on cross-examination the limitations of Rovelli's experience and his testimony, both as an expert and as a fact witness. In addition, the district court advised the jurors that they were free to give opinion testimony whatever weight they thought it deserved or to disregard it entirely, if they believed that the opinion of an expert witness was not sufficiently based on experience or if it was outweighed or contradicted by other evidence.

The content of Sergeant Bair's testimony was more confined by limits of time and

place. As noted, Bair was not offered as an expert witness. He testified primarily about a particular undercover operation in which he participated on April 18, 1997, and about an ensuing search warrant, in the execution of which he also participated. Bair's testimony provided the jury with particularized evidence that it could evaluate with respect to the issue of whether Los Solidos sold narcotics. The jury could also consider Bair's evidence—if persuasive—as possibly corroborating or lending credence to the testimony of Keith Streeter that Los Solidos sold drugs throughout the city of Meriden, and as possibly corroborating Rovelli's testimony about Los Solidos' drug sales in Hartford and other cities.

For the above reasons, we reject Feliciano's argument that the district court manifestly erred by admitting the challenged testimony of Rovelli and Bair.

### E. *The Prosecutor's Closing Statements*

In their summations, defense counsel attacked the credibility of several Government witnesses, including Naomi Rivera and her boyfriend, Wilfredo Abrahante. In addition to calling one of the Government's witnesses a "liar" and a "perjurer," Feliciano's counsel said Naomi Rivera shed "the biggest set of crocodile tears" when she was on the stand. Pagan's counsel spoke of "the utter lack of trustworthiness of government evidence by the witnesses," explicitly including Naomi Rivera and Wilfredo Abrahante ("Abrahante"). Gonzalez's counsel told the jury that "[t]he government's job is to convict these three men" and that "[t]here's no doubt about it, that's their job, and if you don't think, inherent in that, they will do anything to convict people that they think are guilty, to what the law allows, you're denying the process." He also said that many of the Government's witnesses were "liars" and warned the jury not to be "railroaded into this patchwork quilt of lies and cowardice."

In rebuttal closing argument, the prosecutor responded to these attacks:

Why in the world would he [Abrahante] come in and lie, and it wasn't like he came in by choice. Again, we got a forthwith grand jury subpoena and made him come in, and he was hesitant to do so, according to Special Agent Reiner.

He's got no motivation to lie, and he and Naomi [Rivera] tell stories that are consistent in some ways, and off in little details, but that's a sign of truth telling.

Now if we had gotten them together and said, "Okay, let's get your story straight on all the exact details," that would be a suggestion they are not testifying about what they remember independently but what is being concocted, and that's not what was done here.

Feliciano argues that in the closing statements quoted above, the prosecutor vouched for the credibility of the Government's witnesses and testified about the Government's pre-trial relations with these witnesses.

Also in their summations, defense counsel pointed to what they considered to be the lack of forensic evidence connecting the defendants to the murder. Alex Rivera testified that Pagan and Feliciano used a Nissan Stanza on the night of the shooting. Abrahante testified that on the night of the shooting, Pagan picked up Ramos and Feliciano at Naomi Rivera's house and that Pagan was driving a Volkswagen Jetta. As the Government admits, nothing of forensic value was recovered from either car.

The prosecutor responded to the challenge concerning the lack of forensic evidence in her rebuttal summation:

We did check the cars. We analyzed them for forensic evidence. They went over them very carefully, even though it was months after the fact and the likelihood of finding evidence was small. That was done so that if there was anything there that either pointed to these defendants or pointed elsewhere, we would know about it.

Feliciano contends that the prosecutor here improperly invoked the integrity of the United States Attorney's Office and, in effect, testified as to the forensic examination of the vehicles.

■■■■ "A prosecutor's improper summation results in a denial of due process when the improper statements cause substantial prejudice to the defendant.... [D]etermining the existence of substantial prejudice involves three factors: the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of conviction absent the improper statements." *United States v. Modica*, 663 F.2d 1173, 1181 (2d Cir.1981) (citations omitted). "[D]efendants who contend that a prosecutor's remarks warrant reversal face a heavy burden, because the misconduct alleged must be so severe and significant as to result in the denial of their right to a fair trial." *United States v. Rahman*, 189 F.3d 88, 140 (2d Cir.1999) (internal quotation marks omitted), *cert. denied*, —— U.S. ——, 120 S.Ct. 830, 145 L.Ed.2d 698 (2000). "A prosecutor may not properly vouch for the credibility of a witness. However, the government is allowed to respond to an argument that impugns its integrity or the integrity of its case ... and when the defense counsel have attacked the prosecutor's credibility or the credibility of the government agents, the prosecutor is entitled to reply with rebutting language suitable to the occasion." *United States v. Thai*, 29 F.3d 785, 807 (2d Cir.1994) (citations and internal quotation marks omitted).

■■■■ Prior to the statements objected to and without objection, the prosecutor in her rebuttal referred to Naomi Rivera's testimony that she considered herself a friend of Feliciano and was the girlfriend of Feliciano's brother. The prosecutor also made reference to Abrahante's testimony, stating that Abrahante was "an associate of Feliciano [who] lives in that area [and who] knows these people." Also, in the portion of the Government's rebuttal challenged by Feliciano, the prosecutor's

statement that Abrahante "was hesitant to [testify]" makes explicit reference to the testimony of Special Agent Reiner to that effect. Given the defense's statements challenging the credibility of the Government's witnesses and the defense's accusation that the Government was willing to "do anything" to convict the defendants, we find that the Government's response was within permissible bounds to the extent that it referred the jury to evidence at trial concerning Naomi Rivera and Abrahante, on the basis of which the jury could judge whether either witness had a motivation to lie. *See Thai*, 29 F.3d at 807. We note further that FBI Special Agent Peter Lavelle's testimony that the two cars had been searched provided a basis for the prosecutor's statement that "[t]hey went over [the cars] very carefully, even though it was months after the fact and the likelihood of finding evidence was small."

■■■■ While we thus conclude that much of the challenged portion of the Government's rebuttal summation was justified as a response to the defendants' vigorous challenges to the integrity of the Government's case and by reference to the testimony of the Government's witnesses, we feel compelled to note that the prosecutor strained permissible bounds in asserting that the Government did not coach Naomi Rivera and Abrahante to make their testimony consistent and in stating that "[w]e checked the cars." These statements come perilously close to testimony on the prosecutor's part. Nevertheless, we find that any prejudice that might arguably have been caused by these remarks was sufficiently dispelled by the district court's prompt responses and by its final instructions to the jury. *See, e.g., Mapp*, 170 F.3d at 338 ("[A]ny prejudice arguably caused by the prosecutor's remarks was substantially eliminated by a curative instruction promptly given by the trial judge.").

When Feliciano's counsel objected to the prosecutor's statements regarding the

credibility of its witnesses, the district court stated that:

> it is the jurors' recollection of what the evidence was that controls, and if there is an inconsistency, it is their prerogative, as they've been told before and will be told again, to draw their own conclusions as to the evidence itself, and what the inferences are that are reasonable to be drawn.

When Feliciano's counsel objected to the prosecutor's statements about the forensic examination of the cars, the district court said:

> No, she's not testifying.... She's characterizing the evidence as she sees it. If she's correct, than [sic] the jury can react accordingly. If the jury does not credit her version of the evidence, they are free to draw their own conclusions as to the evidence....

In addition, prior to the parties' summations and, again, prior to the jury's deliberations, the district court instructed the jury that counsel's arguments are not evidence and that, while the parties may suggest to the jury what the jury should conclude from the evidence, "it is your recollection and interpretation of the evidence that controls. What the lawyers say is not binding upon you."

Accordingly, we conclude that any prejudice arguably caused by the challenged portions of the prosecutor's rebuttal summation was sufficiently corrected by the district court.

F. *The Sentencing of Nelson Gonzalez*

With respect to punishment, the VCAR states, in pertinent part, that

(a) Whoever ... for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders ... any individual in violation of the laws of any State or the United States ... shall be punished—

(1) for murder, *by death or life imprisonment, or a fine under this title, or both* ...

18 U.S.C. § 1959(a)(1) (emphasis added). The jury having found all three defendants guilty on Count Two (the substantive murder count under Section 1959(a)(1)), the district court sentenced each of the defendants to life imprisonment.[9] At Gonzalez's sentencing, the court stated, with respect to Section 1959(a)(1), that "[t]he law says what the law says, and the law says that I must impose a sentence of life imprisonment upon you." [10]

Gonzalez argues that Section 1959(a)(1), by its plain language, provides the option that one convicted of VCAR murder may be punished by a fine only. He contends that the district court's statement that "I must impose a sentence of life imprisonment upon you" shows that the district court overlooked this option and mistakenly thought that Section 1959(a)(1) provided a term of life imprisonment as a mandatory minimum. He argues therefore that remand to the district court for resentencing is required. We reject this argument.

Whether the district court misunderstood its sentencing authority is reviewed *de novo*. *See United States v. Hurtado*, 47 F.3d 577, 585 (2d Cir.1995). At the sentencing of each defendant, the district court explicitly rejected the possibility of a fine on the ground that no defendant had assets from which a fine of a magnitude appropriate to the offense could be paid. There was, therefore, no realistic possibility of a fine as a satisfactory possibility for punishing the defendants for the brutal, execution-style murder of a 16–year old boy. Given this finding, it was reasonable for the district court to conclude that it had no realistic choice but to

---

**9.** Based on their offense levels and criminal history categories, each defendant was also subject to life imprisonment under the Sentencing Guidelines.

**10.** Gonzalez was also sentenced to ten years' imprisonment on the conspiracy count (Count One), to run concurrently with his sentence for Count Two.

sentence the defendants to life imprisonment. Accordingly, we reject Gonzalez's claim that remand for resentencing is required in this case.

## G. Constitutional Challenges

On appeal, Pagan raises several constitutional challenges that were not raised below. He argues that the VCAR is unconstitutional on its face because: it fails to provide constitutionally sufficient notice as to what conduct is prohibited; it impermissibly imputes the conduct of third parties (the other members of the enterprise) to the defendant; it fails to assure that organized crime will be the subject of prosecution; and it impermissibly predicates a defendant's criminal liability on the basis of his status. Pagan also argues that the VCAR was unconstitutionally applied in this case because the district court failed to require proof of temporal, relational, and/or quantitative relationships that Pagan asserts were required by various elements of the VCAR, and because the district court failed to apply the jurisdictional element of the VCAR to require that the enterprise be engaged in interstate commerce at the time the underlying violent crime was committed.

■ "[V]irtually all circuits in recent years have addressed constitutional challenges to criminal statutes [raised for the first time on appeal] and have either refused to address them because the defendants had neglected to raise them below, or decided to reach them only upon determining that the lower court's failure to address them constituted 'plain error.'" *United States v. Baucum*, 80 F.3d 539, 541 (D.C.Cir.1996) (*per curiam*) (citing cases). There is no reason why Pagan's constitutional challenges could not have been raised below, where he had ample opportunity to raise them and where the district court would have had the opportunity to address them.[11] Accordingly, we find that Pagan waived these challenges. *See United States v. Griffiths*, 47 F.3d 74, 77 (2d Cir.1995); *United States v. Mennuti*, 679 F.2d 1032, 1036 (2d Cir.1982).

■ Moreover, even assuming these challenges were not waived and assuming *arguendo* that it was plain error not to address them, we find that any such putative error did not "seriously affect[ ] the fairness, integrity or public reputation of judicial proceedings." *Olano*, 507 U.S. at 736, 113 S.Ct. 1770. None of the various notice problems raised by Pagan are problems alleged to infect the charges of murder and conspiracy, based on Connecticut law, of which he was convicted. None of Pagan's arguments raise the possibility that he could not have known that he was committing a very serious felony when he participated in the murder of Edwin Ramos. All of the challenges go to the issue of federal jurisdiction. The only issue hinging on the success of Pagan's challenges, therefore, is whether he should have been tried in federal or state court. We do not find that this issue implicates the fairness, integrity or public reputation of judicial proceedings in the circumstances of this case.[12] Thus, the fourth

11. Similar challenges to the VCAR have been made in several cases in this Circuit, many of them prior to the trial of the case at hand. *See, e.g., Torres*, 129 F.3d at 717 (raising facial Commerce Clause challenge to § 1959); *Cutolo*, 861 F.Supp. at 1145 (raising facial and as applied vagueness challenges to § 1959); *United States v. Wei*, 862 F.Supp. 1129, 1138–39 (S.D.N.Y.1994) (raising a vagueness challenge to § 1959); *United States v. Rahman*, No. S3 93 CR. 181, 1994 WL 388927, at *3 (S.D.N.Y. July 22, 1994) (challenging indictment under § 1959 for failing to inform defendant of the essential nature of the racke-

teering enterprise); *United States v. Soler*, No. 94 CR. 533, 1998 WL 167327, at *3 (S.D.N.Y. Apr. 9, 1998) (raising claim that to convict under § 1959, the Government must prove predicate acts for the racketeering enterprise element); *United States v. Booth*, No. 99 Cr. 378, 1999 WL 1192317, at *3–*6 (S.D.N.Y. Dec. 14, 1999) (raising facial and as applied vagueness challenges to § 1959).

12. We note further that in reviewing Feliciano's sufficiency of evidence claim, we have given limited review to the jury instruction issue with respect to the VCAR's racketeering

prong of the *Olano* plain error inquiry is not satisfied here. Accordingly, in our judgment we cannot disturb defendants' convictions under § 1959 on the basis of these constitutional challenges raised for the first time on appeal.

## CONCLUSION

We have considered all of appellants' other arguments and find them to be without merit. The judgment of the district court is affirmed in all respects.

element, to the issue of how an enterprise acts, and to the issue of predicate racketeer-ing acts.