**TWENTY FOUR HOUR FUEL OIL CORP., Plaintiff,**

**v.**

**UNITED STATES of America, et al., Defendants.**

**No. 98–CV–6141 (ILG).**

United States District Court, E.D. New York.

Feb. 23, 1999.

Order Vacated May 17, 1999.

Carl S. Levine & Associates, Roslyn, NY, for Plaintiff.

U.S. Dept. of Justice, Tax Div., Washington, DC, for U.S.

## MEMORANDUM & ORDER

GLASSER, District Judge.

This action was commenced by an order directing the defendants to show cause why they should not be enjoined from enforcing or executing upon Notices of Levy dated September 28, 1998, served upon banks at which plaintiff maintains accounts unless the defendants shall have first afforded plaintiff the opportunity to exhaust its administrative remedies, including its right to appeal the defendants' adverse determination regarding the plaintiff's claim for a refund of taxes paid to which it believes it is entitled. The plaintiff's request for a temporary restraining order, which was embraced by its order to show cause, was denied and a hearing was thereafter held on the plaintiff's motion for a preliminary injunction which extended over a period of four days, and during which, testimony was elicited from six witnesses. At the conclusion thereof, the parties were directed to submit proposed findings of fact and conclusions of law. The Court's findings of fact, which will be restricted to those which are regarded as relevant to the discrete issue before it, are as follows:

The plaintiff corporation, founded in 1988 by Sam Yakobowicz who, from its inception has been its president, is engaged in the wholesale and retail sale of a variety of petroleum products including # 2 fuel oil, diesel and kerosene. The products it sells are purchased and received from as many as twenty bulk storage terminals in New York and New Jersey. Since 1994, the plaintiff has sold house heating oil (# 2 fuel oil) to retail customers; heating oil to commercial customers; # 2 low sulfur clear diesel fuel for highway use to service stations, which requires the payment of 24.3 cents per gallon federal excise tax in addition to assorted state taxes; and to governmental entities which, generally, are exempt from all tax-es. It is only the federal tax which is in issue here.

The plaintiff is licensed by the Internal Revenue Service (IRS) as an ultimate vendor which authorizes it to sell petroleum products on which it has paid the required federal excise tax to customers that are tax-exempt. (The tax exempt customer to which the plaintiff sold fuel which gives rise to this case is the Long Island Rail Road (LIRR). The plaintiff is also licensed by the IRS as a "throughputter," which entitles it to buy taxable petroleum in bulk from a pipeline or barge without having to pre-pay the tax, and to assure payment of the tax which may be due, has posted a bond in the sum of $300,000.

The petroleum purchased by the plaintiff is pumped into its trucks via a pipe from a storage tank at what is referred to as a "rack" at a terminal facility. Petroleum thus purchased requires the plaintiff to pre-pay the federal tax to its supplier. If the petroleum is purchased in bulk from a pipeline or barge in its capacity as a "throughputter," then the plaintiff is required to pay the federal tax on the 9th and 24th day of each month.

Clear diesel fuel purchased by the plaintiff requires the payment by it of the federal tax. Dyed fuel purchased by the plaintiff is not subject to the federal tax and, therefore, no payment is required for it. Home heating oil is always dyed. Service stations may purchase only clear diesel fuel which is taxable. Sales to governmental entities, e.g., the LIRR, whether of clear or dyed fuel is not taxable and the plaintiff delivered both clear and dyed fuel to the LIRR. The delivery tickets pertaining to the fuel sold to the LIRR did not specify whether the fuel delivered was clear or dyed nor did the plaintiff's contract with the LIRR require it to do so.

The foregoing findings provide the backdrop for the issue in this case which is as follows: Clear fuel, which the plaintiff purchased from its suppliers, required a pre-payment of the federal excise tax or the

payment on the 9th and 24th of each month as a throughputter. If the plaintiff then resold that fuel to a service station, it recouped the tax it paid by passing it along to its customer. If, however, the fuel was resold to the LIRR, which is tax exempt, it could not recoup the tax it paid by passing it along to the customer, but seeks to do by filing a claim for a refund of the tax paid. The plaintiff's claim for a refund was denied, an appeal from the denial was not permitted, and hence this suit. The reasons for the denial will become apparent from a continuation of the findings the court here makes. The digression to frame the discrete issue was made in the belief that it would be helpful in relating the findings to it.

The plaintiff's accountant testified as to the procedure followed for determining the amount for which a refund was to be claimed. That testimony is to be found on pages 113–21 of the transcript which explains the figures on plaintiff's exhibit (Px) numbered 27, and the basis upon which a claim for refund was made. The government objected to the admissibility of that exhibit for the reason that, it asserted, the government has not previously seen it, an assertion contradicted by the plaintiff (Tr. 89) who testified that six boxes of documents received in evidence as plaintiff's exhibit 26 were made available to the government. The assertion by the government that it had not seen Px 27 is, more pointedly, belied by its own witness who was asked when for the first time he saw that document and answered "I could not recall" (Tr. 272–73). It is a fair inference from that response that he did not see that exhibit for the first time at the hearing. In any event, the court's invitation to the government to request a continuance to examine Px 27 and cross-examine with respect to it was not accepted (Tr. 112). The government's witness was not as dogmatic as government's counsel in asserting that the plaintiff had not made the relevant documentation available to it. For example, on direct examination the witness testified as follows at pages 169–70 of the transcript:

Q: Did you receive what you believe to be all of the purchase invoices?

A: I have no—I cannot make a determination if I received all of the permitted—purchase invoices. It was related to us by Mr. Bornstein and the officer, principal, officer of Twenty Four Hour Fuel, that we did receive all of them, but I have no independent corroboration of that.

Q. Okay. And what about the delivery tickets? You did get delivery tickets, right?

A. We did receive copies of the delivery tickets.

Q. Did you believe that you got all the delivery tickets of Twenty Four Hours?

A. Again, I have—I cannot make a determination whether I received all of them or not.

On cross-examination that witness testified that no effort was made to corroborate the purchasing information provided by the plaintiff (Tr. 237), nor did he take any steps to corroborate the records of the plaintiff supporting its claims (Tr. 251).

What is significant, however, is the acknowledgment by the government's witness that the analysis reflected on Px 27 is the normal analysis an accountant would make (Tr. 276) and that it was a way of arriving at a determination of the number of gallons sold tax free to a purchaser eligible to buy tax free a product on which the seller had paid a tax (Tr. 278).

The government insisted throughout the trial that its regulations required the plaintiff's delivery tickets to contain a legend indicating whether the fuel being delivered was dyed or clear (See, e.g., Tr. 75, 130, 136, 175). The repeated request of the government to provide the reference to the statute or regulation imposing that requirement was not answered. At the conclusion of the hearing the court requested a specific response to be submitted to that question (Tr. 432) and none was supplied.

It is plain that the government's insistence upon the plaintiff's non-compliance with a non-existent regulation was a factor in the government's determination to deny the plaintiff's claims.

There were additional misconceptions on the part of the government regarding the plaintiff's acts or omissions in the conduct of its business which were glaring and, it is equally plain were factors in the government's determinations. One of the more startling misconceptions was that if taxable gasoline bought at the rack at a terminal was dyed by a terminal employee it became tax free, but if dyed by the purchaser or his employee it remained taxable. The following colloquy is reflected at pp. 286-7 of the transcript between the court and the government witness:

*The Court:* Mr. Handler, can you tell us what regulation you refer to when you say that it makes a difference whether the gasoline is dyed by an employee of the terminal as opposed to an employee? (omitted were the last three words, namely "of the purchaser")

*The Witness:* I don't have the entire set of regs with me, I don't have the number with me. I'm sure we can get it by tomorrow morning or sometime tomorrow.

*The Court:* It's your understanding there's a regulation that says that for tax purposes it makes a difference whether the dye is poured into the truck by a terminal employee as opposed to somebody else?

In one instance it would be tax free, in the other instance it would not?

*The Witness:* I believe so, your Honor. I believe the regulations state it must be dyed at the rack by a terminal employee if they do not have an injection system.

A more graphic illustration of that misconception is reflected in the following colloquy between the Court and another government witness [1] at pages 318-19:

Q: Let me go through it again. X buys taxable fuel at the terminal. It's clear, it does make a difference. It's clear. The tax is paid, correct?

A: Yes.

Q: If that clear fuel were delivered to the railroad, the railroad would not have to pay a tax; is that right?

A: Correct.

Q: The vendor, X, would be entitled to a refund of the tax he paid at the terminal.

A: If he had a UV which the taxpayer has.

Q: Am I correct, he would have been entitled to a refund?

A: Yes.

Q: X buys clear fuel at the terminal, taxable. He then for reasons, which nobody can understand, dies(sic) it red, correct?

A: Yes.

Q: He delivers that same gasoline that he bought at the terminal except now instead of being clear it's red. He delivers that same gasoline to the Long Island Rail Road. The railroad doesn't have to pay a tax on that, correct?

A: correct.

Q: But a tax was paid by X.

A: Supposedly, yes.

Q: Not supposedly. Assume what I'm telling you is a fact.

A: Go ahead.

Q: You're saying now that X is not entitled to a refund because he dyed the fuel red.

A: That's correct.

Q: That's in the regulation?

A: Yes, sir.

1. The "witnesses" in these colloquies are the IRS agents whose audit of the taxpayer resulted in the denial of his claim.

Q: And do you know what the number of the regulation is?

A: No, I do not, sir.

Q: Let me ask you another question.

A: Okay.

Q: If X bought fuel at a terminal and the fuel is red, X doesn't pay an excise tax on that fuel; is that right:

A: Correct.

Q: So there's no occasion for claiming a refund, right?

A: Correct.

Q: If X claimed a refund in the first hypothetical I gave you where he bought clear fuel and then dyed it red for reasons concededly that nobody can understand the reason for, he's not entitled to a refund because is the regulation says so.

A: He altered the fuel.

Q: He's not entitled to a refund because some regulation says so, right?

A: Under what you're saying, yes, ...

At the conclusion of the hearing, the government was directed by the Court to provide the reference to the regulations which made that distinction. None was provided.

There was testimony that the plaintiff allegedly said he dyed clear fuel in his garage, away from the terminal and the consequence of doing so, according to the government witness, was an adverse tax consequence. That is to say, the dyed fuel which would ordinarily be tax free became taxable. The plaintiff denied ever having said he dyed fuel in his garage. That dispute aside, the Court directed the government to provide the reference to the regulation which required that result. That request was addressed in a post-trial memorandum in which the government acknowledged "[T]here is currently no regulation that prohibits fuel from being dyed after removal. To the extent that the United States' Witnesses indicated to the contrary, they were incorrect." (United States' Memorandum in Response to The Court's Questions Regarding the Internal Revenue Service's Fuel Dying and Record–Keeping Requirements at p. 7) ("US Mem.Resp.")

Yet another misconception which in many respects goes to the core of this matter, is the government's view that "because this is a third-party claim, there are no formal appeal rights for the claimed disallowance within the Internal Revenue Service." (Tr. 195). The government's witness was asked if he could provide a reference to a statute or regulation that defines a "third-party claim" as he understood it. And although he believed that there was such a statute or regulations, he was not able, at that moment, to cite the appropriate reference (Tr. 208). When pressed on the point, and shown relevant forms and IRS instructions for completing the form, he could find no reference to a "third party claim" and yet denying the plaintiff an opportunity to appeal the adverse determination was based upon the view that the plaintiff was a third-party claimant and, as such, had no right (Tr. 212–13).

At the conclusion of the hearing, the government was directed to provide the court with authority for that view. In its response, the government acknowledged that the term "third-party claimant" does not appear anywhere in the statute or regulations and that it has not found any provision in the IRS Manual that provides appeal rights for claimants under 26 U.S.C. § 6427($l$) (U.S. Mem.Resp. at p. 5). A reading of § 6427($l$) does not lead the court to conclude that appeal rights are precluded. Indeed, there is nothing in that section which addresses appeal rights at all. Not only was there no reference to "third-party claimant" in any statute, regulation or manual, but the government witness, one of the agents who audited the plaintiff, when asked whether he had found anyplace stating a third-party claimant is

not entitled to an appeal, testified that he had not (Tr. 214).

More significant (and perhaps "egregious" would be more appropriate than "significant") was the agent's acknowledgment that he had erred in his calculations in the amount of approximately $50,000 which would entirely wipe out the amount of refund disallowed (Tr. 268–70). The testimony of the second agent who participated in the audit of the plaintiff also conceded that the schedules they prepared and upon which they made determinations regarding the merits of the plaintiff's claim were inaccurate (Tr. 319–23).

Robert Geffken, called by the defendant, is a machinist who has been employed by the Long Island Rail Road for thirty years. His duties are to test fuel or petroleum products delivered to four railroad facilities. He described the tests he performs as specific gravity and cloud point tests. He keeps a log of the tests which was received in evidence as D × B. His log reflected the color of the fuels he tested as being red, or yellow, or gold-colored. The reds were noted as being dark red or light red. The fuel he tests are samples taken from the tank at the railroad facility into which the fuel is pumped from the delivery truck's hose. He has no knowledge of the color of the various types of fuel delivered to the railroad, nor does he know the product or products that make up a fuel that he observed to be red (Tr. 157). The testimony of this witness was neither informative nor enlightening, regarding the issues in this case.

The government also called Carl Suares, who said he has been an IRS diesel compliance officer since 1995. He testified that his duties consisted of checking clear and dyed diesel fuel to assure compliance with IRS regulations concerning dye concentrations in those fuels. Samples of fuel he obtains are sent to a U.S. Airforce Laboratory which conducts tests for dye concentration and sends the result to Mr. Suares.

Mr. Suares also testified to his belief that fuel could only be dyed at the terminal and not any place else (Tr. 369–70). He also testified to his belief that the plaintiff's delivery tickets were required to bear a stamp that indicated "dyed fuel for nontaxable use only, penalty for taxable use." (Tr. 370). He inspected the plaintiff's trucks and tanks from time to time to determine whether the law regulating the handling of dyed diesel fuel was being violated and never issued a notice of violation to the plaintiff of that law or regulation although he was authorized to do so (Tr. 384). There isn't a line of testimony in the record that references a statute or regulations requiring a specific concentration of dye to a given quantity of fuel, nor is there any testimony in the record as to the consequences attendant upon an improper ratio of dye concentration to a given quantity of fuel. Here again, the testimony of Mr. Suares was based upon misconceptions regarding where fuel must be dyed and the legend delivery tickets must reflect and was neither enlightening nor informative insofar as a resolution of the issue in this case is concerned.

The incomprehensible aspect of the government's position vis a vis the sale of fuel oil to the LIRR, a tax exempt entity, upon the sales to which hinges the plaintiff's right to a refund, is why the plaintiff would dye clear fuel oil sold to the LIRR at all. At pages 433 and 434 of the transcript, the Court said: "I've heard a lot of testimony here about why in the world if the fuel oil being sold to the Long Island Rail Road, which is a tax exempt entity, why in the world would anybody dye that fuel red? Because ... you're going to get a refund if you paid the tax and you're selling it to a tax exempt entity, you're going to get a refund even if it was clear. Why would you dye it red?" To which the government responded: "I don't know, your Honor. We agree that it is ridiculous."

In sum, this Court finds that the determination to deny the plaintiff's claim for a

refund was driven by misconceptions regarding what statutes or regulations required of the plaintiff and by the conclusion implicitly, if not explicitly derived from those misconceptions, namely, that if the plaintiff was not complying with those phantom regulations then it must be operating improperly and, therefore, clearly not entitled to the relief sought.

### Conclusions of Law

The legal conclusions to be reached given the foregoing findings are dictated by a determinations as to whether 26 U.S.C. § 7421(a) is applicable without more, or whether the exception to that statute, plainly enunciated in *J.L. Enochs, District Director of Internal Revenue v. Williams Packing & Navigation Co., Inc.,* 370 U.S. 1, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962) is properly invoked.

 § 7421(a) provided in relevant part that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, . . . ." and is commonly known as the "Anti–Injunction Act." The plain objective of the statute is to preclude interference by the federal judiciary with the ability of the United States to assess and collect taxes it alleges to be due and to require the taxpayer who challenges the right of the government to assess and collect taxes to first pay the disputed amount and then sue for a refund. An exception to that statute was enunciated more than thirty five years ago in *Williams Packing* as follows: "[I]f it is clear that under no circumstances could the Government ultimately prevail, the central purpose of the Act is inapplicable and, . . . the attempted collection may be enjoined if equity jurisdiction otherwise exists. In such a situation, the exaction is merely in 'the guise of a tax.' . . . We believe that the question of whether the Government has a chance of ultimately prevailing is to be determined on the basis of the information available to it at the time of suit. Only if it is then apparent that, under the most liberal view of the law

and the facts, that the United States cannot establish its claim, may the suit for an injunction be maintained. Otherwise, the district court is without jurisdiction, and the complaint must be dismissed. . . . Thus, in general, the Act prohibits suits for injunctions barring the collection of federal taxes when the collecting officers have made the assessments and claim that it is valid." 370 U.S. at 7–8, 82 S.Ct. 1125. It is not enough that an assessment be made and its validity claimed. That the assessment and claimed validity must be made in good faith is plain from the observation in *Williams* that "To require more than good faith on the part of the Government would unduly interfere with . . . protection of the collector from litigation pending a suit for refund." 370 U.S. at 7–8, 82 S.Ct. 1125. Thus, the question to be answered is whether the government acted in good faith in assessing and seeking to enforce the assessment of the tax against this plaintiff.

 The relevant sections of the Internal Revenue Code governing fuel taxes are 26 U.S.C. § 4081(a)(1)(A)(ii) which imposes a tax on the removal of taxable fuel from any terminal and Treasury Regulation § 48.4081–2(b) which provides that the tax is imposed on the removal of the taxable fuel from a terminal if the taxable fuel is removed at the rack. § 48.4082–1 exempts from tax dyed fuel removed from a terminal.

In its proposed conclusions of law, the government sets out a plethora of statutes and regulations which, in this court's reading of them, either have no relevance to the discrete issue of this case, or point to no definitive answer for its resolution.

Indicative of what has already been characterized as a determination made by the government based upon misconceptions of statutory and regulatory requirements, upon conclusions driven by inferences which are speculative rather than logical and by what some might regard as vindictiveness, was the submission by the

government of exhibits lettered M through R long after both sides rested and the record was closed. Not only were these exhibits not in evidence, submitted without opportunity for the plaintiff to object to their consideration and admissibility, but even upon a cursory review run afoul of fundamental rules of evidence, namely hearsay and relevance.

The justification for this plainly improper submission was that the government didn't have the time to present them during the trial, which is remarkable for its disingenuousness. This matter was initiated by order to show cause served upon the government on October 7, 1998. The trial proceeded over a period of four days—October 14, 15, 29 and 30, 1998. At the conclusion thereof the parties were directed to submit proposed findings of fact and conclusions of law which they agreed could be accomplished by November 16, 1998. The new exhibits were submitted by the government at that time.

In response to the plaintiff's properly expressed indignation in a letter to the court dated November 18, 1998, the government, in a response dated November 20, 1998, sought to defend its action by assertions which can only be regarded as startling. It wrote: "The government believes this proffer was appropriate because of the unique nature of the burden that a taxpayer must carry in order to give a court jurisdiction to enter an injunction.... *In such a case we believe it is even appropriate to hypothesize as to what additional facts the government might be able to discover if the normal procedures for resolution of tax disputes were permitted to take their course.... Given this legal framework, it is indeed proper for the government to make arguments as to what else might surface, and it is equally appropriate to proffer new evidence where possible to give such speculation more substance.*" (emphasis added). In support of that view the government cites *University of Texas v. Camenisch*, 451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981); *Qad, Inc. v. ALN Associates, Inc.*, 974

F.2d 834, 838–39 (7th Cir.1992); *Ideal Toy Corp. v. Sayco Doll Corp.*, 302 F.2d 623 (2d Cir.1962) and *Cross v. U.S.*, 1995 WL 835380 (D.Kan.1995), neither of which is read by this Court to sanction the post-hearing submission of evidence by one party of which the other had no prior notice and no opportunity to challenge.

It is interesting to note that the Court's conclusion, expressed above, that the government's determination was driven by inferences which are speculative is confirmed by the government's November 20th response asserting the appropriateness of proffering new evidence to *"give such speculation more substance."*

The Court is not unmindful of the significant purpose to be served by the Anti-Injunction Act and of the importance of precluding judicial intervention in the government's ability to assess and collect taxes. Based upon the findings of fact made after a protracted hearing, however, and under the most liberal view of the law that *Williams Packing* requires, the Court is driven to conclude that the United States cannot establish its claim and it is hereby enjoined from executing upon Notices of Levy dated September 18, 1998, and it is further enjoined to reconsider plaintiff's pending applications for refunds of federal excise taxes expeditiously on the merits.

SO ORDERED.